**PECKAR & ABRAMSON, P.C.**
Charles F. Kenny, Esq.
Denis Serkin, Esq.
70 Grand Avenue
River Edge, NJ  07661
Phone: 201-343-3434
Email: ckenny@pecklaw.com
Email: dserkin@pecklaw.com
Attorneys for Plaintiff,
Durr Mechanical Construction, Inc.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DURR MECHANICAL CONSTRUCTION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PSEG FOSSIL, LLC,<br><br>Defendant. | Civil Action No.: 18-cv-10675<br><br>**AMENDED COMPLAINT** |

Plaintiff, Durr Mechanical Construction, Inc. ("Durr"), by its attorneys, Peckar & Abramson, P.C., for its Amended Complaint against defendant, PSEG Fossil, LLC ("PSEG"), states as follows:

**<u>Local Civil Rule 10.1 Statement</u>**

1.      Durr is a New York corporation, duly authorized to do business in New Jersey with its principal place of business at 2395 Route 715, Tannersville, Pennsylvania. On information and belief, defendant is a Delaware limited liability company with its principal place of business at 80 Park Plaza, Newark, New Jersey 07102.

**Introduction**

2.      This case concerns the malicious, willful, bad faith, and intentional abuse and destruction of a family-owned business, and the lives of its officers and employees, by New Jersey's largest provider of gas and electric service.

3.      PSEG has maliciously and intentionally, in bad faith, withheld millions of dollars that are justly due and owing to Durr for the mechanical construction work that it performed for the Sewaren 7 Project at the Sewaren Generating Station, Woodbridge, New Jersey (the "Project").

4.      To conceal its gross mismanagement of the Project, its failure to properly schedule and failure to properly budget the Project, and in violation of applicable law and the terms of the parties' contract and course of dealings, PSEG has refused to pay Durr undisputed amounts that were and are due and owing for its work on the Project, causing Durr extreme financial hardship.

5.      To pressure Durr into accepting an amount less than is justly due and owing for its work on the Project, PSEG has fabricated offsets, removed work from Durr's scope, and changed the contract payment terms, ignoring the cost reimbursable provisions of the contract.

6.      PSEG has maliciously and intentionally interfered with Durr's relationship with its surety, causing Durr to lose a contract with another entity and other current and future business opportunities.

7.      PSEG has, among other things,

    a)  Short payed applications for payment in violation of law and the applicable
        contract without just cause or rationale;

    b)  Ignored payment applications, again without reason, forcing Durr to act as the
        sole funding source for the Project;

c)  Provided an incomplete design, especially for the Air-Cooled Condenser ("ACC") and the Heat Recovery Steam Generator ("HRSG") system, even though PSEG had such designs for the HRSG in its possession before the bid was issued by PSEG Fossil, LLC

d)  Then, when informed of the design issues, PSEG falsely blamed Durr and placed the financial burden on Durr to resolve PSEG's own design issues;

e)  Refused or neglected to execute change orders for additional work despite a PSEG representative having previously acknowledged that the work was beyond the scope of Durr's contract;

f)  Ignored contractual terms and the parties' course of dealings which demonstrate that the contract price was subject to adjustment based on Durr's actual incurred costs;

g)  Systematically failed to address numerous design and logistical problems at the Sewaren site and at the off-site assembly area – problems that PSEG caused or was responsible for fixing;

h)  Issued unsubstantiated back charges or offsets for work that was not in the contract documents;

i)  De-scoped work for its own convenience and months later claimed a default related to that same work;

j)  Knowingly made unfounded claims of default to Durr's surety; and

k)  Interfered with Durr's other contractual relationships causing Durr to lose hundreds of millions of dollars in current and future revenue.

8.      PSEG has engaged in a pattern of malicious, willful, and bad faith conduct, implemented to force Durr to suffer severe economic and other consequences so that Durr can no longer sustain its normal business operations, thereby enabling PSEG to avoid its obligations to Durr.

## Jurisdiction and Venue

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the matter in controversy, exclusive of interest and costs, exceeds $75,000 and is between citizens of different States.

10.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c) for the following reasons: (i) PSEG has its principal place of business in Newark, New Jersey; (ii) the Project that is the subject of this Complaint is in Woodbridge (Sewaren), New Jersey, and (iii) the causes of action arise out of a contract that was performed in the State of New Jersey.

## Parties

11.      Durr is a multi-generational, family-owned company that has established itself as one of the Northeast area's leading mechanical contractors. Its owners and officers have been active in the leadership of various industry associations. Durr works with customers in the power, process and commercial HVAC markets and is dedicated to delivering projects of the highest quality.

12.      On information and belief, defendant is a subsidiary of PSEG, a publicly traded diversified energy company headquartered in Newark, New Jersey, and owns or operates a portfolio of natural gas, coal and oil-fired electric generating units in New Jersey, Pennsylvania, Connecticut and New York.

## The Sewaren 7 Combined Cycle Power Plant

13.     The overall Sewaren 7 Project involved the design and construction of a dual-fuel, 540 megawatt combined-cycle plant to replace the existing Sewaren Coal-fired Units 1, 2, 3 and 4.

14.     The engineering, design and construction management services were performed by others; non-party Black & Veatch provided the initial design, engineering and construction management services for the Project.

15.     PSEG conceded that Black & Veatch's design contained numerous errors and omissions. As a result, PSEG ultimately took over the construction management from Black & Veatch.

16.     Durr's scope of work on the Project was limited to certain mechanical construction work.

17.     The design for Durr's scope of work was not completed until after Durr and PSEG entered into a contract.

18.     The mechanical work for the Project was originally bid as four separate components:  the HRSG, the Balance of Plant ("BOP"), the ACC and the Centerline ("CL").

## The Bid Documents

19.     On or about May 12, 2016, instead of being given a complete drawing set which could be accurately estimated, Durr and others received, as part of the bid materials, a document called a Bill of Quantity ("BOQ") which set out the type and amount of materials to be used to construct the Project.  The BOQ was supposed to quantify the extent of the Project scope. The BOQ consisted of separate line items in an EXCEL spreadsheet that all bidders were told to use to

price the work.  After the contract between PSEG and Durr was signed and the work started, Durr learned that the BOQ wildly understated the critical elements of the Project.

20.     PSEG knowingly sent Durr and the other bidders the inaccurate BOQ in an attempt to receive lower price quotes for the Project, hoping that the lower bids would hide PSEG's extensive failure to properly budget for the true scope of the Project.

21.     Unknown to Durr, and before Durr entered into its contract with PSEG, many of the drawings were available to PSEG pre-bid, in May 2016, at least for the HRSG component of the Project.  However, they were not shared with Durr until after its contract with PSEG was signed.

22.     PSEG did this knowing that a limited BOQ would cause Durr to submit a lower price proposal based on information that vastly underrepresented the true scope of the Project.

23.     Had the full extent of the scope been set from the beginning of the Project, Durr would have bid and approached the Project a different way.

24.     Before and during construction of the Project, PSEG repeatedly acknowledged that the design for the Project, including said mechanical systems, was incomplete, and that the amount to be paid to Durr for its work on the Project was subject to change based on the final design and field conditions.

25.     PSEG's original request for proposals required that all work be performed at the Sewaren Project location.

26.     Durr's initial proposal encompassed only three of the four components of the mechanical work:  the BOP, the ACC and the CL.

27.     Durr initially declined to provide a proposal for construction of the HRSG on the Sewaren Project site in Sewaren, New Jersey because of manpower, performance and site congestion concerns.

28.     Thereafter, PSEG asked Durr to provide a proposal to perform all the mechanical work for the Project on a cost reimbursable basis.

29.     Thereafter, Durr submitted a second proposal encompassing all four components of the above-noted mechanical work based on the design by Black & Veatch that existed at that time.

30.     That proposal was based solely on the BOQ provided by PSEG because the design was still incomplete and unavailable. PSEG represented that the price for Durr's work would be adjusted depending on the final Black & Veatch design.

31.     To address the lack of design drawings and specifications, Durr proposed, and PSEG accepted, that Durr would be paid for work it performed on a cost reimbursable basis.

32.     To establish an initial monetary value for Durr's work, subject to future adjustments based on the final design, Durr and PSEG negotiated and established a target price, i.e., a price goal assuming the final design matched the BOQ.

33.     Thereafter, PSEG and Durr met to discuss the scope and cost savings for the mechanical work necessary for the overall Sewaren 7 Project. During those meetings PSEG and Durr negotiated costs for all then known aspects of work.

34.     PSEG never informed Durr that the overall Project, of which Durr's work was only a part, was behind schedule and over-budget months before Durr ever became involved.

35.     The negotiations were summarized in a series of spreadsheets, which were drafted and maintained by PSEG. Those spreadsheets were used as the basis for the contract terms,

including the price, and as the basis for the Schedule of Values used by the parties during the Project for processing Durr's payment requisitions.

## The Port of Coeymans

36.     At a meeting on August 9, 2016, due to the limited space at the Sewaren 7 Project location, Durr suggested to PSEG that certain assembly work for a portion of the mechanical components be performed at an offsite facility known as the Port of Coeymans, a marine terminal in upstate New York.

37.     PSEG agreed that because of the size of some of the components for the power plant, including the HRSG, Durr should assemble a portion of the mechanical components at the Port of Coeymans.

38.     PSEG continually reaffirmed and represented that because of the lack of complete design drawings and specifications for the mechanical work, Durr would be paid for all work it performed, no matter where the work was performed, based on mutually agreed-on costs, with an appropriate markup for overhead and profit.

39.     Acknowledging that there would be changes, PSEG repeatedly assured Durr that it would not get hurt on the Project, that PSEG would "make Durr whole," and that if any problems occurred, it would just "off ramp" or de-scope Durr along the way.

40.     PSEG  repeatedly stated that at the end of the Project there would be a "true-up" between what was originally called for in the BOQ and what was required pursuant to the final version of the design.

41.     This was necessary because new and revised drawings (especially for the ACC) kept arriving far into the Project, as late as August and September of 2017, even though Durr was supposed to be done with the Project by December 2017.  See Exhibit 1.

42.     The new and revised drawings substantially revised the BOQ. The drawings changed the quantity of pipe spools, pipe metallurgy, complexity of the welds, number of pipe supports and the complexity of those supports, and the number of valves and appurtenances needed.

43.     The new changes had a devasting effect on the manhours needed to perform the work because, for example, larger pipe diameters or different metallurgies of pipe and wall thickness required more sophisticated and time-consuming welding procedures than originally anticipated.

## The Line in the Sand

44.     Durr submitted its final bid documents based on: (i) the BOQ and (ii) the limited design documents produced to Durr as of September 6, 2016.  Without letting Durr know that the overall Project was behind PSEG's internal schedule and not fully designed, and that thousands of new and revised drawings would be released, PSEG told Durr to stop its cost estimating process and to base the contract price proposal on the design information (the BOQ) that had been presented to date.

45.     Kevin Reimer, the Project director for PSEG, told Durr that PSEG was "drawing a line in the sand" and that Durr should not consider any documents after September 6, 2016 for the purpose of developing its price.  See Exhibit 2.

46.     Mr. Reimer further stated that as part of the "line in the sand," documents transmitted after September 6, 2016 would not be part of the Contract and would be considered "for information only."

47.     Recognizing the "line in the sand," Durr limited the scope section of the Contract (Section 1.2, entitled scope of work, 011002.1 BOQ at pages 45-46) to be performed by Durr to

the drawings released through Addendum 7.  See Exhibit 3. This corresponded to the drawings

that Durr received as of September 6, 2016.

48.     Despite the clear limit to the Contract scope of work, PSEG continues to wrongfully

assert that a massive amount of drawings and revisions that were issued after  September 6, 2016,

including revisions just after that date, are part of the original Contract scope.

49.     In fact, PSEG delivered about 1,224 design documents before the "line in the sand"

and subsequently dumped an additional 18,450 design documents on Durr post-"line in the sand"

from later September 2016 to September 2017.

## The Written Contract

50.     By a written agreement dated as of November 17, 2016 (the "Contract"), Durr

agreed to perform the labor and furnish the materials necessary to construct certain mechanical

work, for which PSEG agreed to pay Durr the consideration set forth in the Contract.

51.     The Contract states that the "Contract Price is not guaranteed." See Exhibit 4.

52.     PSEG administered the Contract as a cost reimbursable contract.

## PSEG's Design Deficiencies

53.     PSEG was responsible for the design for the Project.

54.     PSEG authorized changes to the design after the Contract was executed, which

changes were beyond the contemplation of the parties at the time the Contract was negotiated, and

made the work by Durr more difficult and costly.

55.     PSEG represented to Durr and the Contract required (Section 1.2, Scope of Work,

page 409), that the design for the HRSG and the ACC would be modular so that the HRSG and

ACC could be easily transported with as much pre-assembly as possible at Coeymans. See Exhibit

5.

56.     When the final design plans were issued, after execution of the Contract and the start of construction, the HRSG and ACC were not modularized.

57.     Under the terms of the Contract, PSEG and Durr anticipated that only portions of the HRSG and the ACC would be pre-assembled at Coeymans, after which the components would be shipped to Sewaren with assembly and installation completed at the Sewaren location.

58.     Payment applications and communications between the parties and their representatives during the Project reflected the understanding that the Contract Price was not guaranteed.

59.     PSEG acknowledged that only limited work could be performed at the Port of Coeymans for various reasons, including the fact that a fully assembled HRSG and ACC would be too large to travel under certain Hudson River bridges when transported from Coeymans to Sewaren.

60.     PSEG qualitatively changed the design and sequencing of the mechanical work by failing to provide a modular design, and by making other changes to the original design documents, causing Durr to have to perform work that was not planned or contemplated at an additional cost beyond the amount that was budgeted for the Project all within a reduced schedule.

61.     The mechanical design was incomplete and deficient in numerous respects, including the following:

     a)  The HRSG was not designed as a modular unit, leading to logistical and assembly problems;

     b)  PSEG failed to properly design a method to lower the HRSG onto anchor bolts and failed to correctly locate the anchor bolts;

c) PSEG failed to provide properly-designed pipe supports, which resulted in more expensive in-the-field modifications; and

d) PSEG failed to provide a modularized design for the ACC, especially the windwalls, the components of which required extra time and manpower to assemble in the field.

62.    By reason thereof, Durr has suffered the following:

a) additional and increased costs for loss of efficiency because of the unexpected Additional Work Authorizations PSEG submitted to Durr, as well as other impacts and interferences that PSEG caused;

b) increased general conditions stemming from Durr's inability to fully and adequately price the costs of the Additional Work as the work was being performed and PSEG's refusal to adequately pay for the Additional Work after the work was performed;

c) additional costs incurred for extra work, resulting from PSEG's direct interferences or failure to properly coordinate the work;

d) loss of bonding capacity and other contract opportunities;

e) loss of financial remuneration and opportunities relating to obtaining further projects and new customers;

f) loss of banking and credit relationships; and

g) loss of working capital.

## PSEG's Failure to Manage its other contractors

63.     PSEG also failed to adequately and appropriately manage and coordinate the various contractors working on the Project. As a result, on many occasions, Durr's work was impeded or stopped by other PSEG contractors.

64.     Holtec, the company that PSEG hired to fabricate and deliver the materials for the ACC, failed to ship the fabricated materials to the correct jobsite and, instead, shipped many components meant for the Sewaren site to the Coeymans site, causing further delays to the Project and additional expense to Durr.

65.     A similar issue arose with PSEG's supplier of the HRSG materials, General Electric.  In a May 30, 2017 e-mail, GE admitted to PSEG that it committed an error in fabricating certain pipe, an error that Durr spent time fixing.  See Exhibit 6.  Further, even though PSEG received monetary compensation for GE's errors, it never signed or executed any of the change orders Durr submitted to actually fix the admitted GE errors.

## PSEG's Delayed and Late Drawings

66.     In addition to failing to provide the HRSG documents with the bid documents, PSEG missed critical contract-mandated dates on which it had to produce certain key design documents for the Project.

67.     For example, PSEG had a contractually- mandated deadline of February 17, 2017 to submit certain new drawings. See Exhibit 7.  Instead, PSEG submitted those drawings months behind schedule, leading to further Project delays and causing massive impacts to Durr's work.

68.     PSEG was contractually obligated to procure all major material needed to build the four mechanical piping components of the work at Coeymans and Sewaren.  Notably, major components that Durr needed to complete the Project came in much later than required to permit

Durr to adhere to the original schedule.  Still, PSEG refused to grant any time extensions that would compensate for these delays or to allow Durr to factor the full impact of these PSEG—caused delays into the schedule.

### PSEG's Mishandling of Piping Material

69.     PSEG's mishandling of material that it was supposed to supply to Durr caused additional delays to the Project.  Some of the material that PSEG supplied was missing key components. See Exhibit 8. Other material was incorrectly fabricated by PSEG's pipe supplier, and other material arrived damaged.

70.     Due to PSEG's failures, Durr incurred substantial additional costs for the Project.

71.     However, despite Durr's submission of change order requests totaling $25,198,963.72 to account for changes at Coeymans and another $17,479,057.66 for increases to the Target at Sewaren, other than a $6.9 million purchase order, PSEG largely ignored Durr's change order requests.

72.     Further, despite Durr notifying PSEG that all of its change order requests would have some impact on the schedule, PSEG failed to grant Durr any of its requested time extensions and, instead, kept telling Durr that it needed to stay on the original BOQ schedule.  That direction required Durr to accelerate work at its own cost and expense, subject to its right to claim the additional costs and time caused by PSEG's on-going redesigns and other acts and omissions.

73.     In another showing of bad faith, when pipe or other equipment that PSEG was obligated to provide was late, PSEG's project personnel would tell PSEG's senior executives that the delays caused by the late pipes were caused by Durr.  In fact, the opposite was true.  PSEG had the duty to timely procure correct and undamaged piping material for the Project.

74.     In yet another showing of bad faith, when the piping work could not proceed because PSEG's preceding contractor did not timely install the foundations required for the equipment and the hangers required for the pipe, the field personnel again, either directly stated, or falsely implied, that the delays installing the pipe were due to Durr's failure to act.

75.     Due to the many problems that have nothing to do with Durr, such as the bad, incomplete, or late Black and Veatch design or the incomplete, wrong, damaged or late items from PSEG's suppliers, PSEG needed to make adjustments to the Contract schedule and budget. However, again, acting in bad faith, it refused.

76.     PSEG showed its bad faith through several progress meetings it had with Durr. After one meeting, during which Durr described its additional work, costs and expenses due to PSEG's contractors or other items outside of PSEG's control, PSEG, in violation of the Contract, directed Durr (through meeting minutes) not to submit any more change orders.  See Exhibit 9.

### PSEG's Failure to Make Payments

77.     Durr submitted payment applications to PSEG containing the values for the work that Durr performed ("Payment Applications").

78.     On repeated occasions, PSEG failed to process and pay many of Durr's Payment Applications, and failed to provide a reason for its failure to pay those applications.

79.     On repeated occasions, PSEG "short payed" Durr's Payment Applications by paying an amount less than was requisitioned, and failed to provide a reason for its failure to fully pay those applications.

80.     Durr requisitioned the total sum of $123,658,769.76, of which PSEG has paid only $105,615,180.45, leaving a balance justly due and owing to Durr in the sum of $18,043,589.31 pursuant to the Payment Applications.

**Additional Work at Coeymans**

81.     During the Project, Durr performed additional work at Coeymans beyond that anticipated by the Contract, all at the specific direction of PSEG ("Additional Work"), with an aggregate fair and reasonable value of $16,923,274.80, for which PSEG has wrongfully refused or neglected to make payment.

82.     During the Project, PSEG repeatedly directed Durr to perform additional work based on verbal directions, and a course of dealing developed by which PSEG would direct Durr field and Project management personnel to perform Additional Work based on verbal directions.

83.     PSEG acknowledged and paid for certain Additional Work performed based on a verbal direction by PSEG. On other occasions, after the Additional Work was completed, even though PSEG was fully aware of the nature of such extra or additional work through its field visits and periodic meetings and the associated cost was fully documented, PSEG wrongfully refused to pay for the work.

84.     The unexpected and extraordinary amount of Additional Work that Durr was required to perform within a reduced schedule impacted Durr's performance and caused a loss of efficiency in its work production.

85.     Despite the additional work requests and the design deficiencies and delays by PSEG, PSEG refused to add to the number of personnel at the Project, and instead, in late summer of 2017, began to cut the number of craft labor, management staff, and overtime for the Project.

86.     In addition, the following acts or omissions to act on the part of PSEG caused Durr to incur additional and increased costs of construction, for which Durr has received work authorizations that have not been converted to formal change orders and paid:

a) PSEG produced late and incomplete drawings, especially for the ACC and HRSG;

b) PSEG failed to provide scaffolding to access multiple HRSG piping systems for at least three weeks;

c) PSEG failed to provide foundations for pipe supports;

d) PSEG failed to provide access to drain troughs; and

e) PSEG failed to complete the delivery of the main steam duct parts to Coeymans until weeks after they were promised, leaving Durr with 65% less time to perform 50% more scope.

### PSEG's Malicious, Bad Faith Conduct to Avoid Payment to Durr

87.     After PSEG received the benefit of Durr's work, including taking possession of the major mechanical components that PSEG needed for the Project, PSEG began a concerted effort to avoid its payment obligations by causing Durr extreme financial distress and slowly starving Durr for cash, in the hope of forcing it to accept an amount less than what was reasonably and legally due.

88.     PSEG management knew that the design for the mechanical work was incomplete, contained errors, and that PSEG had mismanaged and misrepresented the nature of the Project to Durr.

89.     Despite the foregoing known design errors, PSEG not only refused to process payments for the additional work that Durr performed, but also again blamed all of the Project's issues and delays on Durr

**Shelby Mechanical and PSEG's Field Progress Measuring Reports**

90.     PSEG further covered up its cost overruns and delays by bringing on another replacement mechanical contractor known as Shelby Mechanical.  Notably, at the time that PSEG brought Shelby onto the Project, PSEG did not default Durr or claim that it was in breach.

91.     As further proof of its nefarious plan, after PSEG brought in Shelby, it changed the way it reported progress for the mechanical piping work to deceptively make it seem like Shelby Mechanical were on budget and on schedule.  To accomplish this, PSEG's Field Project Measuring System ("FPMS") over-reported progress and under-reported scope, just like it had been doing all along for all of the remaining contractors across the entire job, which resulted in schedule and budget slippage that increased as the Project progressed. See Exhibit 10.

92.     Incredibly, and in another showing of bad faith, PSEG had tracked Durr against the original schedule and quantities based on the original BOQ, without adjusting for the hundreds of design changes that happened after the "line in the sand" and other field conditions, including late material deliveries by PSEG.  Then, only after Durr was later de-scoped, did PSEG change its reporting and tracking system.

93.     As PSEG well knew, the BOQ was an inappropriate measure of Durr's progress because it failed to consider the pending change orders and the late-issued and late-revised drawings that added more scope and more complexity to the existing scope.

## Independent Schedule Expert

94.     During the Project, Durr was asked by PSEG to hire a third-party schedule expert to analyze the Project schedule and make recommendations to fix its flaws.  In two reports submitted by that outside schedule consultant (Sand Hill), the independent expert recommended changes to the schedule so that progress could be more accurately tracked. See Exhibit 11.

95.     Despite having asked for such reports, PSEG ignored the recommendations of Sand Hill and insisted on continuing to measure Durr's progress off flawed schedules. In another act of bad faith by PSEG, even after Sand Hill made it perfectly clear that the progress could not be tracked as PSEG had requested, PSEG refused to make changes and continued to use inappropriate benchmarks.

96.     PSEG was fully aware, including based on Durr's weekly financial reports and projections, that the work performed by Durr would cost more than originally budgeted and that the Contract price would need to be adjusted based on Durr's actual costs.

97.     PSEG knew that Durr required timely payments from PSEG to sustain the cash flow expenses that it was incurring to progress the mechanical work for the Project.

98.     Despite the foregoing, in bad faith, as soon as the HRSG was delivered to, and in place at, Sewaren, PSEG ceased paying Durr for work that it had performed, fabricated offsets, and fully de-scoped work from Durr's scope.

99.     At the date of the full de-scope, November 29, 2017, Durr was 87% complete  with its revised Contract work at Sewaren and was 100% complete with its original BOQ Contract scope.

100.     PSEG's bad faith again reared its ugly head when Kevin Reimer admitted to Durr that in de-scoping Durr and in hiring Shelby, PSEG would have to pay more for the Project and

that it would take more time.  Mr. Reimer implied that he and the other PSEG Project personnel did not care because it would serve as cover for them to go to the PSEG Board to ask for more money, instead of admitting that the Project was poorly designed and grossly mismanaged by PSEG from the beginning.

101.    PSEG intentionally stopped and withheld payments to cause Durr to accept an amount less than it had earned for its work on the Project, or to abandon its claims in their entirety.

102.    PSEG, without having a basis to default Durr, and knowing that its action would have a negative impact on Durr's ability to obtain surety bonds, which is crucial to Durr's business, wrote to Durr's surety (Fidelity and Deposit Company of Maryland) and stated that it was considering  defaulting Durr.  See Exhibit 12.

103.    Notably, PSEG had no obligation to send such a letter under the terms of the relevant performance bond.  Durr had already been de-scoped from the Project.

104.    PSEG took this additional step outside the Contract after Durr had informed PSEG that it had about $38 million in Contract balance and outstanding change orders due and owing (without waiving its other additional and increased interest claims) and before any notice of default.

105.    PSEG knew or should have known that such a letter would have a negative and detrimental impact on Durr's bonding capacity and would cause Durr to lose its bonding capacity and limit its ability to enter into future construction contracts.

106.    PSEG's actions were willful, malicious and in bad faith, intended to cause Durr to go out of business or accept an amount less than the fair and reasonable amount that it had earned for its work on the Project.

107.    Because of PSEG's willful, malicious and bad faith actions, Robert Durr, Jr. was forced to resign from the Executive Board of the Mechanical Contractors Association of America, a prestigious organization that enhances Durr's profile in the industry and its ability to obtain future work.

108.    Because of PSEG's willful, malicious and bad faith actions, Durr has been forced to lay off dozens of long- time employees.

109.    Because of PSEG's willful, malicious and bad faith actions, Durr has had its bonding capacity and credit facilities severely limited and has lost contract opportunities and the anticipated profits that would flow from them.

110.    Because of PSEG's willful, malicious and bad faith actions, Durr has incurred penalties and interest because it was, and is, unable to pay subcontractors, suppliers and unions.

111.    PSEG has effectively destroyed Durr, a family business established more than 30 years ago, which had been one of the most highly regarded mechanical contractors in the New York metropolitan area.

112.    PSEG's actions and omissions to act in carrying out this business destruction, plus PSEG's multiple malicious and bad faith actions, triggered liability well beyond the contractual claims asserted in this Complaint.

### Count One (Breach of Contract)

113.    Durr duly performed all terms, conditions, and requirements of the Contract on its part to be performed, except insofar as its performance was waived, frustrated, prohibited or excused by PSEG.

114.     Pursuant to the Contract, Durr earned the total sum of $140,544,832.85, for which

PSEG has paid only the sum of $105,615,180.45, leaving a balance of $34,929,652.39, which

amount is now justly due and owing from PSEG to Durr, with appropriate interest thereon.

115.     Additionally, due to PSEG's malicious, intentional and bad faith conduct, Durr is

entitled to recover additional damages in an amount to be determined, including the lost profits on

current and prospective contracts.

## Count Two (Breach of the Prompt Payment Act)

116.     Durr duly submitted the following payment applications, which PSEG approved

and did not object to, for Durr's work on the Project: ("First Set of Payment Applications"):

| Invoice No. | Date | Amount |
|---|---|---|
| | | |
| 2017-317 | 8/29/2017 | $4,709,010.29 |
| 2017-343 | 9/18/2017 | $3,649,758.25 |
| 2017-358 | 9/25/2017 | $3,212,961.42 |
| 2017-361 | 9/27/2017 | $2,687,682.02 |
| 2017-372 | 10/5/2017 | $2,779,646.14 |
| 2017-404 | 10/25/2017 | $2,918,020.54 |
| 2017-420 | 10/30/2017 | $2,940,084.90 |
| 2017-444 | 11/29/2017 | $2,850,205.60 |
| 2017-453 | 12/12/2017 | $2,542,747.71 |
| 2017-476 | 1/24/2018 | $1,149,960.16 |
| | | |
| Total | | **$29,440,077.03** |

117.     Against this First Set of Payment Applications, PSEG issued only the following

partial payments, and failed to furnish Durr with a written statement describing the amounts

withheld and the reason for withholding the payments within twenty days of receiving each

payment application from Durr, or within any other time required by the Contract or law:

| Invoice No. | Date | Inv. Amount | Amount Paid | Shortfall |
|---|---|---|---|---|
| | | | | |
| 2017-317 | 8/29/2017 | $4,709,010.29 | $4,134,928.54 | $574,081.75 |
| 2017-343 | 9/18/2017 | $3,649,758.25 | $3,201,664.76 | $448,093.49 |
| 2017-358 | 9/25/2017 | $3,212,961.42 | $2,705,281.15 | $507,680.27 |
| 2017-361 | 9/27/2017 | $2,687,682.02 | $2,330,093.69 | $357,588.33 |
| 2017-372 | 10/5/2017 | $2,779,646.14 | $2,566,040.66 | $213,605.48 |
| 2017-404 | 10/25/2017 | $2,918,020.54 | $2,698,588.70 | $219,431.84 |
| 2017-420 | 10/30/2017 | $2,940,084.90 | $2,801,621.84 | $138,463.06 |
| 2017-444 | 11/29/2017 | $2,850,205.60 | $2,708,166.98 | $142,038.62 |
| 2017-453 | 12/12/2017 | $2,542,747.71 | $2,354,286.36 | $188,461.35 |
| 2017-476 | 1/24/2018 | $1,149,960.16 | $1,108,610.51 | $41,349.65 |
| Total | | $29,440,077.03 | $26,609,283.19 | **$2,830,793.84** |

118.     Durr duly submitted the following payment applications, which PSEG approved and did not object to, which were related to Durr's work at the Project: ("Second Set of Payment Applications"):

| Invoice No. | Date | Amount |
|---|---|---|
| 2017-457 | 12/13/2017 | $3,418,959.05 |
| 2018-103 | 2/1/2018 | $81,251.40 |
| 2018-477 | 12/21/2017 | $1,530,549.44 |
| 2018-496 | 8/4/2017 | $230,842.31 |
| 2018-107 | 2/8/2018 | $689,786.44 |
| 2018-118 | 2/23/2018 | $1,261,931.67 |
| 2018-121 | 3/16/2018 | $306,526.25 |
| 2018-126 | 3/21/2018 | $28,065.85 |
| 2018-127 | 3/22/2018 | $7,888.84 |
| 2018-139 | 3/26/2018 | $334,282.33 |
| 2018-144 | 3/29/2018 | $24,567.70 |
| 2018-145 | 3/26/2018 | $23,506.24 |
| 2018-154 | 4/11/2018 | $235,768.40 |
| 2018-155 | 4/11/2018 | $101,058.58 |
| 2018-157 | 4/19/2018 | $1,168,968.53 |
| 2018-158 | 4/19/2018 | $874,277.80 |
| Total | | $10,318,230.83 less $591,379.94 tax credit and pencil copy error = **$9,726,850.89** |

119.    PSEG failed to pay any amounts toward the Second Set of Payment Applications and failed within twenty days of receiving each application from Durr, or within any other time required by the Contract or law, to furnish a written statement describing the amounts withheld and the reason for withholding the payments.

120.    PSEG has failed to pay Durr the total amounts in each payment application listed in the First Set of Payment Applications and within the time required under the New Jersey Prompt Payment Act, N.J.S.A. § 2A:30A-1, *et seq*., and has not properly notified Durr as to why payment is being withheld as required under the New Jersey Prompt Payment Act.

121.    PSEG has failed to pay Durr any of the amounts in each payment application listed in the Second Set of Payment Applications and within the time required pursuant to the New Jersey Prompt Payment Act, N.J.S.A. § 2A:30A-1, *et seq*., and has not properly notified Durr as to why payment is being withheld as required under the Act.

122.    PSEG is in violation of the New Jersey Prompt Payment Act.

123.    By PSEG's acts and omissions to act, the payment applications listed in the First and Second Sets of Payment Applications are deemed approved and certified, and Durr is entitled to the amounts wrongfully withheld, and statutory penalties, interest, and reasonable costs and attorneys' fees pursuant to the New Jersey Prompt Payment Act.

124.    By reason thereof, the sum of $12,557,644.73  is now justly due and owing from PSEG to Durr, with interest thereon at the prime rate plus 1% running from the date that each payment was due (for those applications listed in the First and Second Set of Payment Applications), and costs and attorney's fees.

## **Count Three (Cardinal Change)**

125.     PSEG changed, interfered with, and disrupted Durr's performance, and drastically and profoundly altered the nature of the Project, by, without limitation, its following acts and omissions to act:

    a)  Materially changing the design for the mechanical scope of work;

    b)  Making material and substantial changes to the quantity of pipe spools, pipe metallurgy, complexity of welds, number of pipe supports and the complexity of those supports and the number of valves and appurtenances needed for the work to be installed at the Project;

    b)  Intentionally failing and refusing to pay for the work that Durr has performed on the Project for no valid reason;

    c)  Requiring Durr to perform a material amount of Additional Work causing a loss of productivity and efficiency;

    d)  Forcing Durr to increase manpower and, despite the originally- planned sequence of pipe installation, demanding that Durr install the piping packages out of the originally planned order;

    e)  Failing to cooperate with Durr in addressing job related issues;

    f)  Unilaterally reducing or ignoring Durr's payment applications and forcing Durr to finance its work on the Project for long periods when no payments were forthcoming;

    g)  Refusing to pay Durr for extra work performed due to, and necessitated by, the various aforementioned-issues;

h)  Failing to modularize the design of the HRSG and the ACC, requiring the barge transporting the materials from Coeymans to Sewaren to be enlarged;

i)  Deleting certain scopes of work from the Contract in bad faith; and

j)  Ending Black & Veatch's role as contraction manager and taking on the role itself and thereafter failing to coordinate the various contractors and directing the stacking of trades, putting the safety of workers at risk and reducing productivity. See Exhibit 13.

126.    The foregoing acts and omissions to act by PSEG materially altered the scope of the work to be performed under the Contract, forcing Durr to adjust and deviate from its planned means and methods of performance, and to construct work that was beyond, and very different from, the scope and nature of the original scope of work.

127.    The radical and profound changes in the design and the mechanical scope of work impacted the work, completely and materially changed the overall scope and nature of the work, and together with other material disruptions and impacts to Durr's work, constitute a cardinal change to the Contract.  Durr cannot receive adequate redress under the Contract and is thus entitled to an equitable adjustment in the Contract price in an amount equal to Durr's actual costs, with overhead and profit, less the amount paid to Durr to date.

128.    By reason thereof, Durr is entitled to be paid for all costs incurred for work on the Project, with overhead and profit, in the total amount of $157,653,721.80, less the amount paid to date in the sum of $105,615,180.45, for a total sum of $52,038,541.35 now justly due and owing from PSEG to Durr, with appropriate interest thereon.

## Count Four (Quantum Meruit and Unjust Enrichment)

129.    During the Project, Durr was required to perform additional work because of design changes and PSEG's failure to remain consistent with the Bill of Quantities set out in the bid stage.

130.    Durr incurred additional and increased costs of construction because of, among other things, PSEG's changes to the:

        a)  size of the piping systems at the site;

        b)  type of material for the pipe systems;

        c)  size and quantity of pipe supports and hangers; and

        d)  size of the pipe welds

131.    PSEG received the benefit of Durr's work, labor and services, the fair and reasonable value of which totals $157,653,721.80, of which it has only paid $105,615,180.45, leaving the amount of $52,038,541.35 by which PSEG has been unjustly enriched.

132.    By reason thereof, the sum of $52,038,541.35 is now justly due and owing from PSEG to Durr, with appropriate interest thereon.

## Count Five (Breach of Covenant of Good Faith and Fair Dealing)

133.    PSEG breached the covenant of good faith and fair dealing that is implicit in every contract, by, among other acts or omissions to act, including those set forth above, the following willful, intentional, and malicious actions:

        a) Intentionally and purposefully withholding hundreds of HRSG drawings as part of its May 2016 bid documents for the Project, and instead issuing a Bill of Quantity that vastly underrepresented the type, scope and magnitude of work at the Project.

b) Despite the clear limit to the Contract scope of work based on the "line in the sand", PSEG continues to wrongfully assert that a massive amount of drawings and revisions that were issued after September 6, 2016, including revisions just after the "line in the sand" date, are part of the original Contract scope.

c) Intentionally failing and refusing to pay for the work that Durr has performed and PSEG has already certified;

d) Failing to cooperate with Durr in addressing job related issues;

e) Wrongfully withholding payments due to Durr for no valid reason;

f) Unilaterally reducing and ignoring Durr's invoices and forcing Durr to finance the mechanical work for the Project for long periods when no payments were forthcoming;

g) Refusing to pay Durr for extra work performed due to and necessitated by the various afore-mentioned issues;

h) Making material changes to the size and type of the piping to be installed, the number of welds for the piping and the size of the pipe supports, and refusing to pay for the financial consequences of such changes;

i) Despite the originally planned sequence of pipe installation, PSEG demanded that Durr install the piping packages out of the originally-planned order causing substantially more work than anticipated; and

j) Despite PSEG agreeing to a fixed scope under the Contract, at a certain point PSEG unexpectedly and in bad faith began to remove certain scopes of work from the Contract, and

k)      Intentionally blaming Durr for the budget and schedule overruns at the overall Project, when PSEG knew that Durr did not cause those conditions.

134.    PSEG, in bad faith, withheld tens of millions of dollars it knew was due to Durr, and tried to reinterpret the Contract terms to justify its wrongful actions, to the effect of destroying or injuring the right of Durr to receive the fruits of the Contract and the benefits of its hard work on the Project.

135.    PSEG's actions and omissions constitute failures to act in good faith and in the absence of fair dealing, constituting breaches of the covenant of good faith and fair dealing.

136.    PSEG's issuance, in bad faith, of a BOQ instead of the actual plans and specifications it had in its possession for the HRSG, thus forcing Durr to bid on a Project that became drastically different than originally portrayed by the BOQ, exemplifies PSEG's bad faith and a is a violation of the covenant of good faith and fair dealing.

137.    PSEG's failure to approve change orders and time extensions, even though the scope of the Contract work expanded dramatically from beginning of the Project to the end, exemplifies PSEG's bad faith and is a violation of the covenant of good faith and fair dealing.

138.    PSEG's failure to approve appropriate time extensions to the original Project schedule, even though PSEG and its contractors caused several material delays to the original Project schedule, exemplifies PSEG's bad faith and is a violation of the covenant of good faith and fair dealing.  Further, PSEG's knowledge that many of the material delays on the Project were in no way caused by the acts or omissions of Durr, but instead the acts and omissions of PSEG and its suppliers and contractors, and, at the same time, PSEG blaming Durr for all of the delays at the Project, exemplifies PSEG's bad faith and is a violation of the covenant of good faith and fair dealing.

139.     PSEG's continued and intentional use of the original BOQ and original contract schedule to track the progress of Durr, when: (i) the original scope of the Project changed materially and drastically and (ii) an independent third party scheduling expert explicitly stated that the original schedule in place was not valid and workable, exemplifies PGEG's bad faith and is a violation of the covenant of good faith and fair dealing.

140.     PSEG's failure to make payments that it had approved, and that were and are due under the New Jersey Prompt Payment Act, exemplifies PSEG's bad faith and violation of the covenant of good faith and fair dealing.

141.     PSEG's issuance of fabricated and unsupported offsets and back-charges exemplifies PSEG's bad faith and violation of the covenant of good faith and fair dealing.

142.     PSEG's threats to Durr and its surety exemplifies PSEG's bad faith and violation of the covenant of good faith and fair dealing.

143.     By reason thereof, the sum of $52,038,541.35 is now justly due and owing from PSEG to Durr, with appropriate interest thereon.

144.     Additionally, because of the foregoing malicious, intentional and bad faith conduct by PSEG, Durr is entitled to recover additional damages in an amount to be determined, including lost profits.

## Count Six (Misrepresentation)

145.     As the owner of the Project, PSEG knew, or should have had knowledge of the Project conditions that were unknown to Durr and which Durr could not have reasonably obtained knowledge of prior to the Contract.

146.     As the owner of the Project, PSEG had responsibility for the design and for providing a design that was constructible.

147.     PSEG knew or should have known (and did not tell Durr) that the size of the piping, the material for the piping and the welds for the piping and the pipe supports set out in the Bill of Quantities for the mechanical work were woefully underrepresented in the BOQ and that such piping and its hangars and welds  would have to be materially changed , materially increasing Durr's manpower costs and the schedule for completion of its work.

148.     PSEG should have known that its use of the BOQ quantities in its May 2016 bid (instead of the actual HRSG drawings that already existed), would cause Durr to reply to the BOQ and submit a materially lower bid price for the Project.

149.     PSEG should have known that its representations that it was limiting the scope of the Contract to only include the drawings and specifications received by Durr up to September 6, 2016 (or through the "line in the sand") would cause Durr to rely on that fact when entering into the Contract and setting the Contract price. PSEG then should have known that Durr would be damaged by such reliance, especially when PSEG later insisted that the scope encompassed drawings and specifications issued after September 6, 2016.

150.     PSEG should have known that the undisclosed conditions would adversely affect Durr's performance. Durr could not have anticipated or reasonably discovered these conditions.

151.     PSEG had a duty to disclose to Durr its superior knowledge of the Project conditions, and not to misrepresent the conditions.

152.     PSEG knew that pursuant to the terms of the Contract Durr was entitled to be paid for the actual value of work performed.

153.     In performing the mechanical work, Durr relied upon PSEG's representations as set forth in the Bill of Quantities and other Contract documents, and those in the "line in the sand" which were misleading and contained material omissions.

154.     In performing the mechanical work, Durr relied upon PSEG's representation that the mechanical design was constructible and would not be materially altered, which was false and misleading.

155.     By reason thereof, Durr incurred additional and increased costs of construction in the sum of $52,038,541.35, which amount is now justly due and owing from PSEG to Durr, with appropriate interest thereon.

## Count Seven (Interference with Contract)

156.     PSEG's acts and omissions to act were willful, intentional, and malicious, with the intent to force Durr out of business and force it to capitulate to PSEG and abandon its rights under the Contract and at law.

157.     As set forth above, PSEG wrongfully withheld tens of millions of dollars justly due and owing to Durr, causing it financial hardship, the loss of bonding and the loss of other contract opportunities.

158.     PSEG's malicious conduct is exemplified by PSEG sending an unsolicited letter to Durr's surety, months after Durr was de-scoped off the Project, stating that PSEG was considering defaulting Durr, even though no basis existed, and by the terms of the applicable surety bond, no pre-default letter was required to be issued

159.     By this and PSEG's other inappropriate communications to Durr's surety, and others, and by PSEG's bad faith and willful failure to make payments justly due by the terms of the Contract and law, Durr's banking and bonding capacity have been ruined.

160.     By reason thereof and due directly to PSEG's malicious actions, Durr's surety would not provide the bonding required for a contract in the amount of $142,349,579.40 with

Bechtel Infrastructure and Power Corporation for a project known as the Cricket Valley Energy Center Project (the "Bechtel Contract").

161.     Due to PSEG's malicious and willful failure to pay Durr the amounts due under the Contract and due to PSEG's letter to Durr's surety, which directly caused the surety to refuse to provide a surety bond in connection with the Bechtel Contract, Durr had to cancel the Bechtel Contract.

162.     By the terms of the Bechtel Contract, Durr was entitled to a $16,179,971.00 profit. That amount was lost solely due to the malicious and bad faith acts and omissions of PSEG, including its failure to make payments due and owing to Durr and its threatening correspondence to Durr's surety.

163.     By reason thereof, the sum of $16,179,971.00 is now justly due and owing from PSEG to Durr, with appropriate interest thereon.

### Count Eight (Interference with Prospective Business Advantage)

164.     As a result of the foregoing, Durr has lost capital and bonding capacity necessary to continue as an ongoing mechanical construction contractor, and its reputation in the construction industry has been devastated.

165.     In addition to the Bechtel Contract, Durr had the reasonable prospect of other profitable contracts and projects, which it will not be able to pursue because PSEG has wrongfully withheld millions of dollars due to Durr and caused its credit and bonding capacity to be limited.

166.     But for PSEG's bad faith, intentional, willful, and malicious acts and omissions to act, Durr reasonably would have achieved profits of approximately $5 million annually, or $25 million over the next five years.

167.    By reason thereof, PSEG is liable to Durr for the reasonable lost profits on future work that its bad faith, intentional, willful, and malicious acts and omissions to act have caused, in an amount to be determined at trial, believed to be the sum of $25 million representing lost profits over the next five years, in addition to the $16,179,971.00 that Durr would have earned on the Bechtel Contract, with appropriate interest thereon, for a total of $41,179,971.00 in addition to any contract balance due and owing to Durr.

168.    By reason thereof, PSEG is liable to Durr for its lost profits on the Bechtel Contract and other prospective work, in an amount to be determined at trial, which is believed to be not less than the sum of $41,179,971.00, which amount is now justly due and owing from PSEG to Durr, with appropriate interest thereon.

WHEREFORE, Durr respectfully requests that this Court award it the following amounts:

(a) On Count One, the sum of $34,929,652.39, with appropriate interest thereon, and lost profits and other damages in an amount to be determined;

(b) On Count Two, the sum of $12,557,644.73, with other relief pursuant to the New Jersey Prompt Payment Act, including interest at the prime rate plus 1% from the date that payment was due, costs and attorney's fees;

(c) On Count Three, Four and Six, the sum of $52,038,541.35, with appropriate interest thereon;

(d) On Count Five, the sum of $52,038,541.35, with appropriate interest thereon and lost profits and other damages in an amount to be determined;

(e) On Count Seven, an amount to be determined at trial, believed to be not less than the sum of $16,179,971.00, with appropriate interest thereon;

(f) On Count Eight, an amount to be determined at trial, believed to be not less than the sum of $41,179,971.00, with appropriate interest thereon;

(g) On all counts together, in the sum of $93,218,512.35;

(h) Together with Durr's costs and disbursements, including reasonable attorney's fees, and such other relief as the Court may deem proper.

Dated: May 22, 2020

**PECKAR & ABRAMSON, P.C.**
Attorneys for Plaintiff,
Durr Mechanical Construction, Inc.

By: /s/ Denis Serkin
Charles F. Kenny, Esq.
Denis Serkin, Esq.
70 Grand Avenue
River Edge, NJ  07661
Phone: 201-343-3434

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on this date, the enclosed Complaint along with Civil Cover Sheet and

Summons were electronically filed with the Clerk of the Court via the CM/ECF System.

Dated:  May 22, 2020

                                                    **PECKAR & ABRAMSON, P.C.**
Attorneys for Plaintiff,
Durr Mechanical Construction, Inc.

By: <u>/s/ Denis Serkin</u>
Charles F. Kenny, Esq.
Denis Serkin, Esq.
70 Grand Avenue
River Edge, NJ  07661
Phone: 201-343-3434

4355115