UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DURR MECHANICAL CONSTRUCTION, INC.,**<br><br>    **Plaintiff,**<br><br>    v.<br><br>**PSEG FOSSIL, LLC,**<br><br>    **Defendant.** | Civ. No. 18-10675 (KM) (CLW)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

PSEG Fossil, LLC, an energy company, hired Durr Mechanical Construction, Inc., a contractor, to construct a power plant. The project and their relationship went awry, so Durr sued PSEG, asserting contract, quasi-contract, and tort claims. PSEG moves to dismiss most of those claims. (DE 62.)[1] For the following reasons, PSEG's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

**I.   BACKGROUND**

  **A. Facts**

PSEG sought to build a power plant (the "Project"). (Am. Compl. ¶ 13.) Instead of providing drawings of the plant to potential contractors to estimate their bids for the Project, PSEG provided a Bill of Quantity ("BOQ") that "set out the type and amount of materials to be used to construct the Project." (*Id.* ¶ 19.) In effect, the BOQ "quantif[ied] the extent of the Project scope." (*Id.*)

---

[1]    Certain citations to the record are abbreviated as follows:

    DE = docket entry

    Am. Compl. = Amended Complaint (DE 59)

    Mot. = PSEG's Brief in Support of its Motion to Dismiss (DE 62-1)

    Opp. = Durr's Opposition to PSEG's Motion to Dismiss (DE 67)

    Reply = PSEG's Reply Brief in Support of its Motion to Dismiss (DE 68)

Relying on the BOQ, Durr bid on portions of the project, which PSEG accepted, and began work. (*Id.*)

It became clear that "the BOQ wildly understated the critical elements of the Project." (*Id.*) Although PSEG had drawings available at bidding time, PSEG chose to send bidders the inaccurate BOQ in order to receive lower quotes for a Project for which PSEG had not properly budgeted. (*Id.* ¶¶ 20–22.) Unbeknownst to Durr when it began work, the Project was already behind schedule and over-budget. (*Id.* ¶ 34.)

As the Project moved forward, PSEG asked Durr for a proposal to perform all mechanical work for the Project, instead of just the components it originally bid on. (*Id.* ¶ 28.) Durr did so, and since there were no drawings, "Durr proposed, and PSEG accepted, that Durr would be paid for work it performed on a cost reimbursable basis." (*Id.* ¶ 31.) "To establish an initial monetary value for Durr's work, subject to future adjustments based on the final design, Durr and PSEG negotiated and established a target price, i.e., a price goal assuming the final design matched the BOQ." (*Id.* ¶ 32.)

The Project continued, and new drawings kept arriving. (*Id.* ¶ 41.) These drawings "substantially revised the BOQ" and changed all types of specifications. (*Id.* ¶ 42.) Such changes caused Durr to spend more manpower and money. (*Id.* ¶ 43.) Nonetheless, PSEG assured Durr "that at the end of the Project there would be a 'true-up' between what was originally called for in the BOQ and what was required pursuant to the final version of the design." (*Id.* ¶ 40.)

At one point, however, PSEG purported to draw "a line in the sand." (*Id.* ¶ 45.) When Durr submitted its final bid documents, PSEG's Project director, Kevin Reimer, told Durr that it should not consider any documents after September 2016 for purpose of developing its price. (*Id.* ¶¶ 44–45.) So PSEG and Durr finalized a contract in November 2016 that limited the scope of work based on documents received as of September 2016. (*Id.* ¶ 47.) Nonetheless,

the contract provided that PSEG had the right to change the scope of work. (DE 62-3 at 43–44.)[2]

Despite the "line in the sand," PSEG continued to authorize design changes and send drawings. (*Id.* ¶¶ 49, 54.) Indeed, it became clear that numerous aspects of the mechanical design had been incomplete, requiring costly, mid-Project changes. (*Id.* ¶ 61.) Further complicating the Project, PSEG failed to manage the other contractors or provide necessary, promised supplies. (*Id.* ¶¶ 63, 69, 73.) Not only that, PSEG had Durr perform additional work at another site. (*Id.* ¶¶ 81–82.)

All the while, Durr submitted progress payment applications to PSEG for the work it had performed, which PSEG failed to pay. (*Id.* ¶¶ 77–78) When the Project was finally completed, "PSEG began a concerted effort to avoid its payment obligations" entirely. (*Id.* ¶ 87.) PSEG hoped that Durr would "accept an amount less than it had earned for its work on the Project, or to abandon its claims." (*Id.* ¶ 101.) As part of this effort, PSEG informed Durr's surety that PSEG was considering declaring Durr to be in default—even though PSEG owed Durr money under the contract. (*Id.* ¶¶ 102–04.) As a result of actions like these, PSEG "has effectively destroyed Durr" and allegedly owes Durr tens of millions of dollars. (*Id.* ¶¶ 111, 114.)

## B. Procedural History

Durr filed this action against PSEG. (DE 1.) The currently operative Amended Complaint asserts eight claims:

(1) breach of contract (Am. Compl. ¶¶ 113–15);

(2) violation of New Jersey Prompt Payment Act, N.J. Stat. Ann. § 2A:30A-1, *et seq.* (Am. Compl. ¶¶ 116–24);

(3) cardinal change (*id.* ¶¶ 125–28);

---

[2] The Amended Complaint relied on and attached as exhibits certain excerpts of the contract. (DE 48-8) PSEG submitted the entire contract with its motion to dismiss (DE 62-3, 62-4). Because the contract is "integral to or explicitly relied upon in the complaint," and its authenticity is not disputed, I may consider it on a motion to dismiss. *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) (citation omitted).

3

(4) quantum meruit and unjust enrichment (*id.* ¶¶ 129–32);

(5) breach of the covenant of good faith and fair dealing (*id.* ¶¶ 133–44);

(6) misrepresentation (*id.* ¶¶ 145–55);

(7) tortious interference with contract (*id.* ¶¶ 156–63); and

(8) tortious interference with prospective advantage (*id.* ¶¶ 164–68).

PSEG moves to dismiss Counts 3 through 8. (Mot.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations. Still, the pleading must contain "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *See Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). The facts in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & Trs. Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

## III. DISCUSSION

I apply the foregoing motion-to-dismiss standards to each claim. In sum, I hold that the claims of cardinal change (Count 3) and tortious interference with contract (Count 7) require dismissal, while the rest survive.

### A. Cardinal Change Claim

Count 3 is a claim under the "cardinal change" doctrine. (Am. Compl. ¶¶ 125–28.) This doctrine, derived from federal government contracts law, holds that "when the government effects an alteration in the work so drastic

that it effectively requires the contractor to perform duties materially different from those originally bargained for," then the government has effected a "cardinal change" and is in breach. *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) (citation omitted). The doctrine arose because government contracts often grant the government significant leeway to modify the contract. Its purpose is to place an equitable limit on the scope of modifications so that they cannot be too "drastic." *Green Mgmt. Corp. v. United States*, 42 Fed. Cl. 411, 429 (1998); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 763 n.3 (4th Cir. 1993).

PSEG argues that this federal government-contracts doctrine is not cognizable under New Jersey law. (Mot. at 7–11.) I agree.

"[I]t is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002). Neither the New Jersey Supreme Court nor the Appellate Division has precedentially recognized the doctrine, a circumstance which strongly weighs against this Court's recognizing it. *See Crystallex Int'l Corp. v. Petreoleos De Venezuela, S.A.*, 879 F.3d 79, 84 (3d Cir. 2018) (when applying state law, federal courts look mostly to the state supreme court and then to intermediate courts). Durr acknowledges as much, but nevertheless argues that I should recognize the doctrine, for two reasons. (Opp. at 5.) Neither is persuasive.

First, Durr cites two non-precedential Appellate Division cases which, it says, support recognition of the doctrine for purposes of New Jersey contract law. (*Id.* at 5–7.) At the outset, because those decisions are not binding, they do not establish state law. *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 160–62 (1948); *see Ryu v. Bank of Hope*, Civ. No. 19-18998, 2021 WL 50255, at *5 n.7 (D.N.J. Jan. 6, 2021). *But see In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 525–26 (3d Cir. 2019) (relying on unpublished Appellate Division cases, in the context of confirming a "strong intimation" from the New Jersey Supreme Court). I consider these two cases for

5

their persuasive value, but I find that they cannot bear the weight Durr places on them.

In the first, *St. Joseph's Hospital & Medical Center v. Muirfield Construction*, the Appellate Division seemingly alluded to the cardinal change doctrine (though not by name). It did so in the course of holding that a clause precluding damages from "delays" did not bar recovery for certain major changes which "lay beyond the 'scope' of the contracts." No. A-6620-99T2, slip op. at 2–3, 93–94 (N.J. Super. Ct. App. Div. July 29, 2003) (per curiam) (copy provided at DE 67-3).[3] The rationale, however, boiled down to a finding that the changes did not qualify as "delays" under the contract. This was not so much an application of the cardinal change doctrine, then, as it was an ordinary case of contract interpretation.

In the second case, *Ponns & Thomas Co., Inc. v. State of New Jersey, Department of Transportation*, a contractor argued that "the cardinal change doctrine [had] been 'constructively adopted' in New Jersey." The contractor sought to recover under the doctrine because it had been required to perform additional, unanticipated work. No. A-6137-98T5, slip op. at 3–4 (N.J. Super. Ct. App. Div. Oct. 5, 2000) (copy provided at DE 67-4). The trial court held that even if the doctrine applied, there was no such drastic change, and the Appellate Division summarily affirmed. *Id.* at 4. Both the trial court and the Appellate Division, then, seemingly assumed *arguendo* that the doctrine applied in the course of holding that it would not help the contractor. Neither the trial nor appellate court explicitly adopted the cardinal change doctrine.

Neither *Ponns* nor *St. Joseph's,* then, would strongly support a conclusion that the cardinal change doctrine has been or would be adopted as part of New Jersey contract law.

---

[3]     The opinion was drastically redacted for publication at 829 A.2d 652 (N.J. Super. Ct. App. Div. 2003). I cite the unpublished slip opinion, which contains the relevant discussion.

6

Next, Durr points to a handful of supportive cases from other jurisdictions and argues that the New Jersey Supreme Court would likely follow suit. (Opp. at 7–10.) Lacking more specific guidance, a federal court may identify a majority view and predict that a state supreme court would adopt it. *See Ryu*, 2021 WL 50255, at *4 n.5 (citations omitted). Here, however, none of the cases are from state supreme courts. What is more, in most of the cases cited, the court merely acknowledged the doctrine, without adopting it. *Roy F. Weston Servs., Inc. v. Halliburton Nus Envtl. Corp.*, No. CIV. A. 1993 WL 57182, at *3 (E.D. Pa. Mar. 3, 1993) (acknowledging the doctrine but holding that, regardless, plaintiff could not prevail on it); *Fuller Co. v. Brown Minneapolis Tank & Fabricating Co.*, 678 F. Supp. 506, 509 (E.D. Pa. 1987) (same); *Naek Constr. Co. v. PAG Charles St. Ltd. P'ship*, No. CV020080135S, 2004 WL 2757623, at *6 (Conn. Super. Ct. Nov. 3, 2004) (noting that doctrine was effectively already incorporated into other doctrines under Connecticut law).[4] Durr's smattering of case citations does not represent anything close to a prevailing view.

Even when considering a genuine majority view, a federal court must assess whether that view comports with the state's law or is otherwise persuasive. *See Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294, 1304 (11th Cir. 2017). By that standard, I find little in the way of a persuasive rationale for importing the cardinal change doctrine. For starters, the doctrine grew out of peculiarities of federal government contracting law—particularly, the need to

---

[4] Durr cites two federal cases where the court adopted the doctrine after performing an *Erie* analysis: *Hartford Cas. Ins. Co. v. City of Marathon*, 825 F. Supp. 2d 1276, 1287 (S.D. Fla. 2011), and *L.K. Comstock & Co. v. Beacon Constr. Co.*, 932 F. Supp. 906, 936 (E.D. Ky. 1993). Neither deserve weight. *Hartford* has no precedential value because it was vacated by the Eleventh Circuit, which held that the district court had lacked jurisdiction to enter judgment on that claim. *Hartford Cas. Ins. Co. v. Intrastate Const. Corp.*, 501 F. App'x 929, 937 (11th Cir. 2012). As to *L.K. Comstock*, other federal courts have declined to follow it, finding its reasoning unpersuasive. *Ebenisterie Beaubois Ltee v. Marous Bros. Constr., Inc.*, No. 02-cv-985, 2002 WL 32818011, at *4–5 (N.D. Ohio Oct. 17, 2002).

temper the potential unfairness resulting from the federal government's paramount authority to alter contracts in the public interest. Those peculiarities do not arise in contracts between private parties, which may account for the doctrine's absence from the New Jersey case law. Indeed, the doctrine is in considerable tension with principles of New Jersey law. "The cardinal change doctrine is based on the notion that even though an express contractual provision exists governing changes to the contract, . . . some changes are nonetheless 'so severe' that extracontractual relief is appropriate." *Ebenisterie Beaubois Ltee v. Marous Bros. Constr., Inc.*, No. 02 CV 985, 2002 WL 32818011, at *4 (N.D. Ohio Oct. 17, 2002). Under New Jersey law, however, express provisions prevail over implied provisions. *Kas Oriental Rugs, Inc. v. Ellman*, 926 A.2d 387, 392 (N.J. Super. Ct. App. Div. 2007). That principle is hard to square with a doctrine recognizing extracontractual relief, a mismatch that has persuaded federal courts applying similar state laws to reject the cardinal change doctrine. *Ebenisterie,* 2002 WL 32818011, at *4 (Ohio law); *Mellon Stuart Constr., Inc. v. Metro. Water Reclamation Dist. of Chi.*, No. 94 C 1915, 1995 WL 124133, at *5 (N.D. Ill. Mar. 20, 1995) (Illinois law); *Litton Sys., Inc. v. Frigitemp Corp.*, 613 F. Supp. 1377, 1382 (S.D. Miss. 1985) (Mississippi law).

I find no compelling reason to recognize a cardinal change doctrine claim under New Jersey law, and decline to do so. The motion to dismiss Count 3 is therefore granted.

### B. Quantum Meruit/Unjust Enrichment Claim

Count 4 is a claim of quantum meruit and unjust enrichment. (Am. Compl. ¶¶ 129–32.) Quantum meruit and unjust enrichment are often pleaded as separate claims, but they are similar, and both fall under the umbrella of quasi-contract. *Compare Canadian Nat'l Ry. v. Vertis, Inc.*, 811 F. Supp. 2d 1028, 1033 (D.N.J. 2011) (discussing quantum meruit), *with id.* at 1034 (discussing unjust enrichment).

PSEG moves to discuss this quasi-contract claim as duplicative of the breach of contract claim in Count 1. (Mot. at 18–19.) I have explained before why this argument often fails to persuade:

> It is true, of course, that double *recovery* is prohibited; a claimant cannot collect damages for breach of express contract and recover the same damages on a quasi-contract theory . . . . But what a claimant may recover is distinct from what a claimant may plead, and Federal Rule of Civil Procedure 8(d) permits alternative and inconsistent pleading of claims. Accordingly, federal courts applying New Jersey law have generally declined to dismiss quasi-contract claims that are pleaded along with express contract claims.

*Gap Props., LLC v. Cairo*, Civ. No. 19-20117, 2020 WL 7183509, at *4 (D.N.J. Sept. 17, 2020) (citations omitted).

Where the quasi-contract claim is truly just the contract claim by another name, I might dismiss it as superfluous. This, however, is an understandable case of backup or alternative pleading. The quasi-contract claim seeks to recover for "*additional* work." (Am. Compl. ¶ 129 (emphasis added).) Durr's theory seems to be that if the Court finds that the Contract does not literally provide for recovery on any additional work performed—which cannot be ruled out at this early stage—then Durr should still be able to recover via a quasi-contract theory. Because such alternative pleading is permissible, the motion to dismiss Count 4 is denied.

### C. Implied Covenant of Good Faith and Fair Dealing

Count 5 is a claim for breach of the implied covenant of good faith and fair dealing. (Am. Compl. ¶¶ 133–44.) Every contract is deemed to contain that implied covenant. *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (N.J. 2002). A claim of breach "arises when the other party has acted consistent with the contract's literal terms, but has done so in such a manner so as to 'have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]'" *Id.* at 1262 (quoting *Bak-A-Lam Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 351 A.2d 349, 352 (N.J. 1976)). PSEG moves to dismiss this claim because it is duplicative and insufficiently alleged. (Mot. at 19–22.)

It is true that, "[a]s in the case of quasi-contract, a plaintiff cannot prevail on both theories; when a party breaches an explicit term of a contract, a plaintiff can only bring a breach of contract claim." *Gap*, 2020 WL 7183509, at *4 (citing *Wade*, 798 A.2d at 1261). But here, Durr's allegations go beyond allegations that PSEG simply violated a contract term. *Compare id.* at *5. In fact, Durr alleges nearly a dozen specific examples of bad faith. (Am. Compl. ¶ 133(a)–(k).) For example, Durr alleges that PSEG intentionally withheld drawings and issued a BOQ that underrepresented the project. (*Id.* ¶ 133(a).) Such delay and misrepresentation, according to Durr, had the "effect of destroying or injuring the right of the other party to receive the fruits of the contract," *Wade*, 798 A.2d at 1262 (citation omitted)—*i.e.*, it impeded Durr's ability to complete the project on time and receive compensation from PSEG. Thus, Durr has alleged that PSEG's conduct encompassed not only literal violations of the contractual terms, but also bad-faith conduct intended to thwart Durr's performance.

PSEG argues that these allegations, even if not duplicative, fall short of the standard for bad faith. A plaintiff must allege that "the defendant act[ed] with ill motives and without any legitimate purpose." *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 329 (3d Cir. 2006). "[A]n allegation of bad faith . . . should not be permitted to be advanced in the abstract and absent improper motive." *Id.* (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001)). Durr alleges ill motives. Specifically, Durr alleges that "PSEG intentionally stopped and withheld payments to cause Durr to accept an amount less than it had earned for its work on the Project, or to abandon its claims in their entirety." (Am. Compl. ¶ 101.) This is not a simple "defendant failed to pay" allegation. Rather, this allegation shows that PSEG had the design to not only breach the contract, but to do so in a way to strongarm Durr into accepting this non-performance. Indeed, Durr also alleges that PSEG's actions were part of "a concerted effort to avoid its payment obligations by causing Durr extreme financial distress and slowly starving Durr for cash, in

the hope of forcing it to accept an amount less than what was reasonably and legally due." (Am. Compl. ¶ 87.) One can infer from these allegations (assuming for now, as we must, that they are correct) that PSEG had the ill motive to frustrate Durr's ability to perform.[5]

For these reasons, the motion to dismiss Count 5 is denied.

### D. Misrepresentation

Count 6 is a "misrepresentation" claim. (Am. Compl. ¶¶ 145–55.) New Jersey recognizes negligent misrepresentation claims, *Green v. Morgan Props.*, 73 A.3d 478, 493–94 (N.J. 2013), and intentional misrepresentation claims, more commonly called fraud, *Boyko v. Am. Int'l Grp.*, Civ. No. 08-2214, 2009 WL 5194425, at *3 (D.N.J. Dec. 23, 2009) (citing *Jewish Ctr. of Sussex Cnty. v. Whale*, 432 A.2d 521, 524 (N.J. 1981)). Either way, says PSEG, the economic loss doctrine bars the claim, which in any event is not adequately alleged. (Mot. at 22.)

#### 1. Economic Loss Doctrine

The economic loss doctrine "precludes tort claims where the allegedly tortious conduct is intrinsic to the contract—*i.e.*, where the alleged tort consists of the breach of a contractual promise." *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 159 (D.N.J. 2013). In deciding whether the doctrine applies, we focus on "whether the plaintiff's entitlement to economic losses flows directly from obligations set forth in a contract." *State Cap. Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 678 (D.N.J. 2009). The doctrine does not apply, however, when a

---

[5] I distinguish the cases cited by PSEG which found allegations of bad faith inadequate. Those cases, unlike this one, did not allege a concerted effort to prevent the plaintiff from receiving the benefit of the bargain. *Coda v. Constellation Energy Power Choice*, LLC, Civ. No. 17-3437, 2018 WL 3201796, at *8 (D.N.J. June 29, 2018) (no bad faith when contract allowed energy company to change variable rates and customer complained that the rates increased too much); *Greenskies Renewable Energy, LLC v. Arch Ins. Co.*, Civ. No. 16-5243, 2017 WL 4023287, at *4 (D.N.J. Sept. 13, 2017) (no bad faith when defendant merely disagreed with plaintiff's interpretation of contract).

party uses misrepresentations to induce another into entering an agreement. *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 465 (D.N.J. 2020).[6]

The distinction between a claim of fraudulent breach (impermissible) and fraudulent inducement (permissible) forces the court to tread a "fine line." 940 F. Supp. 2d at 159. Examples help. In one case, a hazelnut spread manufacturer contracted with a warehouse to store its products. Prior to execution of the contract, the warehouse inaccurately represented that it had adequate liability insurance. *Wilhelm Reuss GmbH & Co. KG, Lebensmittelwerk v. E. Coast Warehouse & Distrib. Corp.*, Civ. No. 16-4370, 2018 WL 3122332, at *1 (D.N.J. June 26, 2018). The products became infested, the warehouse's insurer declined to provide coverage, and, as a result, the manufacturer faced extensive damages. *Id.* The court held that the warehouse's misrepresentation regarding its insurance coverage induced the manufacturer to enter the contract, and that the economic loss doctrine therefore did not bar the tort claim. *Id.* at *5–6.

In another case, a printing company sought a printing press to meet its expanded needs, and a seller represented that it had a suitable model. *G & F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 585 (D.N.J. 2014). The press did not work properly, and the printing company alleged that

---

[6] No New Jersey Supreme Court case applies the economic loss doctrine to bar misrepresentation claims. Indeed, as the Appellate Division and Third Circuit have both pointed out, there is no precedential New Jersey state court decision to that effect. *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 144 (3d Cir. 2001), *abrogated on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emps.*, 571 U.S. 177 (2014); *Petric & Assocs., Inc. v. CCA Civil, Inc.*, No. A-3571-17T2, 2020 WL 3041418, at *10 (N.J. Super. Ct. App. Div. June 8, 2020) (per curiam). As noted in *Petric,* however, the U.S. District Court for the District of New Jersey has consistently applied the doctrine in that manner. *Id.* I find these precedents are persuasive. *See Pre-Settlement Fin., LLC v. Ellis*, Civ. No. 18-06339, 2020 WL 5743036, at *5 n.6 (D.N.J. Sept. 24, 2020) (decisions from federal courts applying law of the state in which they are located are worthy of deference (citation omitted)).

it was not the model the seller represented it to be. *Id.* at 586. The court held that the company stated a fraudulent inducement claim, so the economic loss doctrine did not apply, because the misrepresentation as to the type of model induced the company to purchase it. *Id.* at 593.

Some of the allegations in Count 6 resemble *Wilhem* and *G & F*. Prior to contract formation, PSEG allegedly misrepresented and withheld material information regarding the conditions of the Project. (Am. Compl. ¶¶ 145–51.) Durr alleges that it entered into the contract only because it believed those misrepresentations. (*Id.*) Such a claim is distinct from a claim that the other party breached its contractual obligations.[7] Accordingly, I will not dismiss the misrepresentation claim based on the economic loss doctrine.

### 2. Adequacy of Allegations

Next, PSEG argues that Count 6 fails to state a claim. (Mot. at 23–25.) I disagree, but first I must nail down the type of misrepresentation claim Durr pleads and whether a heightened pleading standard applies.

#### a. Rule 9(b)

As a threshold matter, PSEG argues that the misrepresentation claim is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Whether misrepresentation claims are subject to Rule 9(b) depends on a close analysis of whether the factual allegations sound in negligence or fraud.

On one hand, the Third Circuit has held that "where the claims are expressly premised on negligence rather than fraud," Rule 9(b) is inapplicable.

---

[7] A caveat. *Some* of the allegations in Count 6 appear to overlap with "obligations set forth in a contract," so the economic loss doctrine could bar them. *State Cap.*, 646 F. Supp. 2d at 678. For example, Count 6 alleges that Durr relied on PSEG's "line in the sand" representations during negotiations, but it also cites provisions *in the contract* as the basis for believing that its work would be limited to drawings as of September 2016. (Am. Compl. ¶ 153.) I have not been asked to, and I do not, separate Count 6 into permissible and impermissible sub-theories, though that may come later.

*In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 272 (3d Cir. 2006). "[W]here the plaintiff has exercised care in differentiating asserted negligence claims from fraud claims and in delineating the allegations that support the negligence cause of action as distinct from the fraud, the determination is straightforward." *Id.* at 273. On the other hand, a court must assess whether allegations "sound in fraud" by "examin[ing] the factual allegations that support a particular legal claim." *Id.* at 270 (citation omitted). As a result, when a complaint incorporates fraud-like allegations (for example, that a defendant knowingly made a false statement), the claim may sound in fraud and be subject to Rule 9(b). *See id.* at 274; *see also Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 86 n.3 (3d Cir. 2015); *Livingston v. Trane Inc.*, Civ. No. 17-6480, 2019 WL 397982, at *3 (D.N.J. Jan. 31, 2019).[8]

      Durr has not "exercised care in differentiating asserted negligence claims from fraud claims," so it must take the bitter with the sweet, and I will apply Rule 9(b) across the board. *Suprema*, 438 F.3d at 272. A key distinction between fraudulent and negligent misrepresentation claims is that fraud requires knowledge of falsity. *Compare Allstate N.J. Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015) (fraud requires "knowledge or belief by the defendant of [a statement's] falsity" (citation omitted)), *with Singer v. Beach Trading Co.*, 876 A.2d 885, 891 (N.J. Super. Ct. App. Div. 2005) (statements are negligently made when "defendants owed plaintiff a duty to exercise reasonable care in communicating facts" and breached that duty). Likewise, for cases involving a failure to disclose, fraud claims require that the defendant deliberately suppressed the fact, while negligent misrepresentation claims do not require such deliberateness. *Compare Winslow v. Corp. Exp., Inc.*, 834 A.2d 1037, 1044 (N.J. Super. Ct. App. Div. 2003) ("The [d]eliberate suppression of a material fact

---

[8]    Because the inquiry focuses on factual allegations, that Durr's brief construes its claim as one for negligent misrepresentation is of no moment. *See Gap*, 2020 WL 7183509, at *5 ("[L]egal theories set forth in [a] brief are helpful only to the extent that they find support in the allegations set forth in the complaint." (quoting *Pa. ex. rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988))).

that should be disclosed is viewed as equivalent to a material misrepresentation (i.e., an affirmative misrepresentation), which will support a common law fraud action." (quotation marks and citation omitted)), *with Karu v. Feldman*, 574 A.2d 420, 426 (N.J. 1990) ("[C]ourts have recognized a cause of action based on negligent misrepresentation when a party fails to provide the correct information at a time when it might affect future actions, where there is a duty to disclose."). At bottom, fraud requires "the intent to deceive." *In re Y.L.*, 99 A.3d 377, 380 (N.J. Super. Ct. App. Div. 2014); *see also Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1196 (N.J. 2000) ("Because negligent misrepresentation does not require scienter as an element, it is easier to prove than fraud.").

Many of the allegations state that PSEG "knew or should have known" about certain facts and failed to disclose them. (*E.g.*, Am. Compl. ¶ 147.) Although sometimes "knew or should have known" is an allegation relevant to whether a duty existed, *see H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 143 (N.J. 1983) (citation omitted), more often "knew or should have known" allegations mean that the plaintiff is alleging a knowing, deliberate misrepresentation. *Livingston*, 2019 WL 397982, at *3 (allegations that a defendant "*knowingly* sold . . . defective systems" "do not amount to nothing more than negligence—they sound in fraud" (alterations, quotation marks, and citation omitted)); *Union Ink Co. v. AT&T Corp.*, 801 A.2d 361, 366 (N.J. Super. Ct. App. Div. 2002) (complaint "charge[d] knowing misrepresentation" when it used "knew or should have known").

Other allegations, too, may support an inference of fraudulent intent. For example, Durr alleges that PSEG misrepresented the BOQ, "caus[ing] Durr to reply to the BOQ and submit a materially lower bid price for the Project." (Am. Compl. ¶ 148.) The circumstances (for example, the discrepancy between the BOQ and the drawings PSEG had in its possession) suggest intentional misrepresentation of the BOQ, and an obvious motive to do so (a lower bid price). And indeed, the entire theme of the Amended Complaint is "the

15

malicious, willful, . . . and intentional abuse and destruction of a family-owned business." (*Id.* ¶ 2.)

In short, the Amended Complaint and Count 6 specifically contain plenty of fraud and fraud-like allegations, and do not "expressly premise[]" the allegations "on negligence rather than fraud," so Durr cannot avoid Rule 9(b). *Suprema*, 438 F.3d at 272.

### b. Failure to State a Claim

I therefore apply Rule 9(b) standards in deciding whether Count 6 succeeds in pleading fraud. Fraud claims require "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate*, 117 A.3d at 1231 (citation omitted).

Those requirements are met. First, PSEG materially misrepresented the scope of the project by providing a BOQ that underestimated the materials needed. Second, PSEG knew that the BOQ was misleading because PSEG had drawings at the time that more accurately captured the Project's scope. Third, PSEG intended for Durr to rely on the misleading BOQ because that was all PSEG provided to Durr. Fourth, Durr relied on the BOQ to bid on the project and begin its work. And fifth, Durr faced damages due to the misrepresentation, both in extra costs to complete the Project and the fallout with PSEG that in turn led to injuries to its business. (Am. Compl. ¶¶ 19–23.) Thus, the elements of fraud are plausibly pleaded.

Still, in pleading those elements, Rule 9(b) requires that the plaintiff plead "the who, what, when, where, and how of the events at issue." *U.S. ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (citation omitted). Where appropriate, though, courts may apply Rule 9(b) "with some flexibility." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 934 n.17 (3d Cir. 1999) (citation omitted). The bottom-line inquiry is whether the plaintiff "'inject[ed] precision or some measure of substantiation

16

into a fraud allegation' and [] state[d] 'the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged.'" *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018) (quoting *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007)).

The allegations are sufficiently specific to put PSEG on notice of what misconduct Durr is alleging. The Amended Complaint alerts PSEG that Durr is zeroing in on the bid process occurring around May 12, 2016. (Am. Compl. ¶ 19.) The claim will turn on a comparison of the BOQ provided on that date and the drawings PSEG had in possession at the time. Those facts place PSEG on sufficient notice of the particulars of Durr's claim.[9]

For these reasons, the motion to dismiss Count 6 is denied.

### E. Tortious Interference Claims

Counts 7 and 8 allege tortious interference with contract and prospective economic advantage. (Am. Compl. ¶¶ 156–68.) PSEG argues that these claims are (1) inadequately alleged, (2) barred by the contract's exculpatory clause, and (3) barred by the economic loss doctrine. (Mot. at 25.)

#### 1. Failure to State a Claim

Tortious interference claims require (1) a contract or prospective contract, (2) defendant's intentional interference without justification, (3) a reasonable likelihood that the interference caused the loss of contract or prospective gain, and (4) resulting damages. *Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharm.,* Civ. No. 18-17462, 2020 WL 7090688, at *15 & n.22 (D.N.J. Dec. 4, 2020) (citations omitted), *appeal docketed,* No. 20-3638 (3d Cir. Dec. 31, 2020).

---

[9] As noted, *supra* n.7, Count 6 presses multiple theories of misrepresentation. PSEG does not attack them individually or argue for partial dismissal. For present purposes, I will not dismiss the Count because at least one theory states a claim and meets the pleading standard.

17

Durr's Count 8 prospective-advantage claim fails on the second element. To intentionally interfere with prospective advantage, "a defendant must have knowledge of a specific contract and intend to interfere with that contract. . . . [A]llegations that a defendant intended to interfere with a category of contracts or a plaintiff's business more generally are not enough—a tortious interference claim requires more targeted actions." *Id.* at *15 (citations omitted). Count 8 does not plead any interference. Rather, Count 8's theory is that because PSEG withheld payment, Durr's credit and bonding capacity were limited, and Durr lost business as a result. (Am. Compl. ¶¶ 165–66.) There is no allegation that PSEG had any direct, intentional role in Durr's relationships with potential businesses (whoever they are). In fact, Count 8 is more a claim for consequential damages resulting from a breach. Tortious interference with prospective advantage requires something different. *Cf. Trico Equip., Inc. v. Manor*, Civ. No. 08-5561, 2011 WL 705703, at *4 (D.N.J. Feb. 22, 2011) (dismissing tortious interference claim because it "lack[ed] any allegations that are separate and distinct from [the] breach of contract claim"). Count 8 will be dismissed.

In contrast, the Count 7 claim of tortious interference with contract is sufficiently alleged because it focuses specifically on the surety contract. First, Durr had a protected interest in its surety contract. Second, PSEG intentionally and maliciously interfered with that contract by notifying the surety that Durr was likely to default, when in fact, PSEG owed Durr payment. (Am. Compl. ¶ 158.) PSEG argues that this communication was in the standard course of business and so cannot be malicious. (Mot. at 28 (citing *Graco, Inc. v. PMC Global, Inc.*, Civ. No. 08-1304, 2009 WL 904010, at *33 (D.N.J. Mar. 31, 2009)).) I must, however, accept as true the allegation that Durr was *not* nearing default, so PSEG had no justification for its representation to the surety. Third, Durr lost its surety contract or the benefit thereof because, following PSEG's communication, the surety declined to provide bonding for another one of Durr's projects. (Am. Compl. ¶ 160.) And fourth, that

18

declination resulted in damages because that project would have netted Durr $16 million in profit. (*Id.* ¶ 162.) Thus, Count 7 states a claim.

I next consider whether, as to the adequately pled Count 7, either the exculpatory clause or economic loss doctrine nevertheless requires dismissal.

### 2. Exculpatory Clause

PSEG argues that the contract's exculpatory clause bars the tortious interference with contract claim. (Mot. at 25–26.) That clause provides, in essence, (a) that PSEG's tort liability for any claims arising out of the contract cannot exceed the contract price, and (b) that PSEG cannot be held liable for consequential damages, including "bonding capacity" or "business opportunities." (DE 62-3 at 68–69 (capitalization altered).)

Such exculpatory clauses, however, cannot reach willful conduct. *Kane v. U-Haul Int'l Inc.*, 218 F. App'x 163, 167 (3d Cir. 2007) (citing *Tessler & Son, Inc., v. Sonitrol Sec. Sys. of N. N.J., Inc.*, 497 A.2d 530, 533 (N.J. Super. Ct. App. Div. 1985)). A defendant acts willfully when it "consciously and intentionally does some wrongful act." *Id.* (quoting *McLaughlin v. Rova Farms, Inc.*, 266 A.2d 284, 293 (N.J. 1970)). The tortious interference with contract claim is based on willful conduct—*i.e.,* an alleged intentional misrepresentation to the surety that Durr would likely default. (Am. Compl. ¶¶ 158–61.) As alleged, this would be an intentional and wrongful act, so the exculpatory clause does not apply.

### 3. Economic Loss Doctrine

Finally, PSEG argues that the economic loss doctrine bars the tortious interference with contract claim. (Mot. at 30.) As explained, that doctrine applies when "the plaintiff's entitlement to economic losses flows *directly* from obligations set forth in a contract." *State Cap.*, 646 F. Supp. 2d at 678 (emphasis added). The doctrine does not apply when a plaintiff alleges that the defendant's conduct breached an "independent duty," rather than a duty imposed by the contract. *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002).

Durr alleges that, by wrongfully contacting the surety, PSEG breached an independent duty, namely the duty not to provide false, damaging information to third parties. PSEG does not point to any obligations in the contract that outline how PSEG is to deal with Durr's surety. (*See* Mot. at 30.) Rather, this claim is concerned with PSEG's actions outside the contract with a third party. At this stage, I cannot say that the contract subsumes PSEG's extrinsic conduct regarding the surety.

\* \* \*

Count 8 is dismissed because it fails to state a claim, but Count 7 is plausibly alleged and not barred by either the exculpatory clause or the economic loss doctrine. The motion to dismiss is granted as to Count 8 but denied as to Count 7.

## IV. CONCLUSION

For the reasons set forth above, Counts 3 and 8 are dismissed, but the motion to dismiss the remaining claims is otherwise denied.

A separate order will issue.

Dated: January 29, 2021

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty
United States District Judge**